#### FOR THE

## COUNTY OF BENNINGTON,

### FEBRUARY TERM, 1852.

---

PRESENT,

HON. STEPHEN ROYCE, CHIEF JUDGE.
HON. ISAAC F. REDFIELD, } ASSISTANT JUDGES.
HON. PIERPOINT ISHAM, }

---

LUTHER LOOMIS *v.* BENJAMIN F. FAY AND LYMAN PATCHIN.

[IN CHANCERY.]

The opinion was delivered at Rutland, Circuit term, July, 1852.

### *Chancery. The Answer. Fraud.*

When the defendant is not supposed to possess personal knowledge in regard to the facts set forth in the bill, and in his answer does not profess any, the answer is not to be taken as evidence of the truth of its denial, and therefore, required to be overcome by something more than the testimony of one witness. In such cases it leaves the matter of facts, upon the proofs in the case.

The surrender of a fictitious or forged bond, held by the creditor, for the benefit of the surety, where the same was of no possible use to the surety, except, as a matter *in terrorem,* is nothing for which a court of equity will decree an exoneration of the surety.

Loomis *v.* Fay and Patchin.

An indorsement made to a bank under an express written agreement from the president, that the indorser should never be holden upon the indorsement, would be inoperative, as a fraud upon the bank; and a parol agreement, to that effect, could not be received to contradict or explain the indorsement, unless to show fraud in the indorser.

And even if the fact was fully established in a court of equity, it would still impose upon the indorser, the obligation to refund to an innocent purchaser of the note, whatever sum he should be induced to pay out in faith of the indorsement, which was apparently valid and binding. *Quere,* As to how far notice to defendants, of a defense claimed before purchase, will deprive them of this equity.

REDFIELD, J. Cases of this kind should be *tried* in the court of chancery before they are brought into this court, &c.

APPEAL from the court of chancery. The facts of the case sufficiently appear in the opinion of the court.

*D. Roberts, Jr.,* for orator.

*P. Isham* and *J. S. Robinson* for defendants.

The opinion of the court was delivered by

REDFIELD, J. This bill is brought to compel the defendants to deliver up to be cancelled, or perpetually be enjoined from sueing the plaintiff upon certain notes indorsed by the orator, to the Bank of Bennington, (and which were purchased by the defendants of the receiver of that Bank,) on the ground of fraud in the Bank, in obtaining them, and failure to perform the stipulations and conditions upon which they were obtained, and also the improper surrender of other collateral securities.

It is first alledged, that in the month of October, 1840, at the city of New York, S. C. Raymond, the president of the Bank of Bennington, agreed to loan to George C. Knight, of the same city, eleven thousand dollars. That the loan was made to Knight upon certain promissory notes, bills and drafts, drawn by various persons for various sums, a schedule of which is set forth. It is also alledged, that Knight gave his own note for the amount of the loan, and also a bond signed by " L. Loomis and others," for $15,-000, as security.

After this loan, and before payment or the surrendering of any of the securities, Knight applied to that Bank, for an additional loan of twenty thousand dollars, which Raymond agreed to make

upon having an additional bond for ten thousand dollars. Raymond's letter stating the conditions of the loan in detail, is set forth in the bill; upon this second contract it is alledged, the bank made sundry advances, but to what amount is not alledged.

And on the 13th day of March, 1841, Raymond co-operating with said George C. Knight and one Palmer Cleaveland, to injure, defraud and deceive the orator, proposed to said Cleaveland to procure the orator's indorsement to secure the Bank of Bennington for Knight's indebtedness to them. And the three applied to the orator and requested him to indorse three promissory notes to the Bank of Bennington, amounting to fourteen thousand dollars, and to induce him to make the indorsement, represented to the orator, that the Bank held the securities before named, and which they concurred in declaring to your orator were sufficient to protect him in his indorsement. And, therefore, he indorsed the notes drawn by Cleaveland, payable to the orator, and they passed into the hands of the Bank. And it was agreed at the time of the indorsement, that the orator should not be called upon to pay the notes, but they should be met by the arrangement hereinafter set forth, between Raymond, Knight and Cleaveland. This was done without any consideration, benefit or advantage to the orator, and so understood by Raymond at the time.

The contract made at the time, between Knight, Cleaveland and Raymond, is set forth in the bill, *in haec verba.* By this it would seem that in consideration of receiving Loomis' notes or security for $14,000 of Knight's indebtedness to the Bank, Raymond agreed to loan $5,000, every thirty days, to the mining company, on condition that Cleaveland's notes, indorsed by orator, should be paid promptly, at maturity. The indorsement of *$14,000* by Loomis, is denominated in this contract, " as satisfactory security for the sum of $14,000, for and on account of the liabilities of said George C. Knight to the said Bank of Bennington."

This contract was at the same time assigned by Cleaveland to the orator, as collateral security for his indorsements. The payments under this contract were, by the terms of the assignment, to go to the orator, if Cleaveland did not meet the notes indorsed by the orator, at maturity, until the orator should be fully indemnified, but if Cleaveland met these notes then the assignment was to have no effect.

Raymond also gave Knight a receipt for the notes indorsed by the orator, the obligation of which was " to place them to the credit of Knight when collected."

The orator alledges that the Bank did not perform this contract on their part, in that they refused to make the loan as stipulated. [The loans were, by express condition, made to depend upon the payment of Cleaveland's notes being paid at maturity.]

The orator further 'alledges, that before he made the indorsement for security of Knight's indebtedness to the Bank of Bennington, they had in addition to the securities above named, $15,-000 of bills of the Citizen's Bank, Augusta, Maine, and also a large amount of notes, bills and checks, a list of which is set forth in the bill.　And subsequently, and without the knowledge of the orator, Raymond, (on behalf of the Bank,) entered into a secret agreement with Knight, by which a portion of the securities were surrendered up to him, and the principal portion, upon which the orator chiefly relied for his indemnity, and which Raymond represented as being ample, at the time the orator made the indorsement.　And on that occasion, the said Raymond gave said Knight a writing agreeing to surrender all collateral securities held by the Bank, upon being secured $7,000 in William Matson's note, and also the notes of Palmer Cleaveland indorsed by the orator, and remaining unpaid to the amount of $9,000, and also the note of the mining company for $5,000.　This agreement was made on the 23d of June, 1841.

In pursuance of this agreement most of the other securities were surrendered, and Knight and Cleaveland have become altogether insolvent; orator has requested the Bank to give up the notes indorsed by him to be cancelled, which they decline to do.　On the fifteenth day of November, 1841, the Bank of Bennington failed and became insolvent, and by the order of the chancellor, their effects went into the hands of a receiver, and two of the notes indorsed by the orator, went into the hands of the receiver, and on the 12th day of November, 1845, were sold at public auction, to the defendants, for a small sum, but how much the orator is not informed.

The defendant Fay has sued the $4,000 note, in Bennington County, by summoning Lyman Atwater as trustee.

Prayer— For perpetual injunction against collecting, or negotiating either of said notes.

We have thus given a minute synopsis of the entire bill. The defendants are not supposed to possess any personal knowledge in regard to the facts, and in their answer do not profess any. They deny substantially all the allegations in the bill, from which any liability could fairly be deduced.

We are not inclined to regard the answer under such circumstances, as evidence of the truth of its denial, and therefore required to be overcome by something more than the testimony of one witness. It merely leaves the matter of fact upon the other proofs in the case.

The first charge against the Bank of Bennington, is the loan of eleven thousand dollars, and taking security by way of a bond of fifteen thousand dollars, and then surrendering the bond after obtaining the indorsement for $14,000, as collateral security for this sum. This, it is attempted to be inferred, was done by a secret arrangement between Knight and Raymond, without the knowledge of the plaintiff.

The great defect in this charge and in the proof is, that this bond was, as to the only name relied upon, a fictitious security, a mere fraud, and as to all the other signers, wholly worthless. The proof is abundant, and wholly uncontradicted, upon this point. In this part of the transaction, the Bank of Bennington, through Raymond, seem to have been made the victims of one of the most bare-faced frauds ever perpetrated. And one cannot help fearing that Knight must have had accomplices, and how many and whom, it is easy to conjecture, but difficult to know.

This bond was of no possible use to Knight's sureties except, as a matter *in terrorem,* and the surrender of such a right by the creditor, is nothing for which a court of equity, will decree an exoneration of the sureties. And it is not very satisfactorily proved that Raymond consented to the surrender of this bond, such as it was. It is probable, that Mitchell connived at Knight's taking it, but Raymond expressly denies any such agreement or expectation on his part.

The charge in the bill, in regard to the twenty thousand dollar loan, may be dismissed by saying it was never carried into effect. All the proof upon this point, renders that absolutely certain.

There remains then, the contract of the 13th of March, 1841, by which the plaintiff's indorsement of Palmer Cleaveland's notes

for $14,000 was obtained. In regard to this, it is charged first, that the indorsement was fraudulently obtained by a virtual conspiracy between Raymond, Cleaveland and Knight. And secondly, that the securities upon which the plaintiff was induced to rely at the time of making his indorsement, and which it was represented to him were ample, were surrendered to Knight without the plaintiff's knowledge, and in fraud of his rights. It is also claimed, that the consideration for the indorsement on the part of the Bank was not performed by them or by Raymond.

In regard to the first point, the orator relies upon the testimony of Knight, Thaddeus Spencer, George A. Loomis, and others. But it does not seem to us, that it can fairly be said that there is any proof of any fraud practiced upon the plaintiff, in obtaining his indorsement; or at all events, that Raymond participated in any such fraud. There is no proof whatever, that Raymond ever made any representations himself to plaintiff, or that he ever made any specific representations to others, which he authorized them to communicate to plaintiff, or that any such were made to the plaintiff, as coming from Raymond, which he did rely upon; nor is there anything in the case, to show that Raymond ever made any assertion as to safety of plaintiff, in making such indorsements, which he did not believe at the time to be true.

But there are some obvious features about the transaction which tend very fully to satisfy us, that the plaintiff made no reliance at the time, upon any representations of Raymond.

1. He knew, and all knew, that Raymond stood in an antagonist attitude to Knight, and Cleaveland, and plaintiff; Raymond was endeavoring to get security for Knight's former indebtedness to the Bank of Bennington. And he stood alone almost, except his son was present, for some purpose, and whether to aid his father or help himself is not certain.

2. Knight was, and always remained, to the time of giving his testimony, the tried and confidential friend of the plaintiff. Spencer says he (Knight,) first proposed getting the plaintiff's indorsement. And although Spencer says, Raymond joined with the others in giving assurances, of the perfect safety of Judge Loomis in indorsing, and others testify that it was never expected Judge Loomis would pay these indorsements, Knight does not so represent the matter. He says expressly, that plaintiff was induced to make

the indorsements, at the request of Cleaveland, Spencer and himself, not naming Raymond. And the reason he assigns, for their uniting in this effort is, that they were all interested in the Lead Company, and that is no doubt the true reason.

And Knight, when asked by whom it was expected these notes would be paid if Cleaveland failed to pay them, said he did not know, "But I supposed Luther Loomis would be called upon to pay them," which is certainly a very obvious inference under the circumstances. Now it is undeniable, that this witness, with all his sins upon him, and they seem to be manifold, has stated the plain unvarnished truth about this transaction. It is corroborated by all the circumstances in the case, and by all the other testimony in the case that is reliable or credible.

It is impossible for any sensible man to believe George A. Loomis' testimony, as to the admission of Raymond, at the time he was giving his testimony to be used in this case, almost *in extremis*, and still admitting to the son of the plaintiff, that his entire testimony was but a tissue of falsehood.

3. It is obvious to me that the real motive on the part of Knight, Cleaveland, Spencer, and Luther Loomis, in procuring, and in giving this indorsement, was to raise the credit of the Lead Company stock. They were all deeply, and one might almost say desperately involved, directly and indirectly, as owner and holders of this stock. While Raymond, at that time had little or no interest in this stock ; his son had some at the time, and it is not improbable he might then have entertained purposes of adventuring in it more or less thereafter. But his chief object seems to have been to put his money and that of the Bank, to good use and keep it safe. The only wonder is, that he could, (after being cheated as he had, by Knight and others,) have made the slightest reliance upon their professions.

I have no apprehension, that the plaintiff, or Knight, or Raymond, perhaps, expected at the time, that plaintiff would be called upon to pay the note he then indorsed. That is never expected when a surety signs a note. But to say that from such an expectation is to be extorted the agreement that his indorsement should not impose any obligation, is certainly a very liberal interpretation of reasonable expectation. The truth is, he did know and must have known, that he would be holden to the Bank, as

Knight says, and as plaintiff told Raymond in the presence of Weed, upon the failure of Cleaveland to pay. An express written agreement, that he should not be holden, would have been inoperative as a fraud upon the Bank, and a parol agreement to that effect could not have been made to contradict or explain the indorsement, unless to show fraud in the indorsee.

4. It is obvious to us, that Loomis, in endorsing Cleaveland's notes, at the time relied a good deal upon the contract of Raymond, which was then assigned to him as his security, so that he could obtain the $5,000 payments to reimburse himself. But he must have seen by the very writing itself, that one of these contracts was not dependent upon the other. His endorsements were expressly stipulated in the contract as satisfactory security to the Bank of Bennington for that amount of Knight's indebtedness to them. But the promised loan to the Lead Company was made dependent upon two conditions, the payment of Loomis' endorsements, and also the notes upon which the advances were made to the Lead Company, and these payments were expressly stipulated to be made promptly, or Raymond should not be bound to make further loans to the Lead Company. Now as Loomis in my belief made a chief reliance upon this contract, as the inducement or security to him for making the indorsement, if Raymond had essentially failed in performing on his part, I might think it reasonable that plaintiff should be exonerated.

But it seems to us, that the failure was altogether on the part of Cleaveland and Loomis, and in the very point which it was expressly stipulated should excuse Raymond from making further advances to the Lead Company.

A great deal more might be said to show that Raymond practiced no fraud in obtaining the notes indorsed by plaintiff, and that there was no binding stipulation that the indorsements should not be obligatory, and no such failure to perform on the part of Raymond as will exonerate Loomis from the obligation incurred by his indorsement, but it is needless. All the circumstances and most of the express testimony upon both sides tends altogether in that direction, and whatever is of an opposite tendency is so slight, or attended with such marks of doubt or distrust, as not to shake at all our perfect confidence in the general current of the testimony upon this point.

In regard to the surrender of securities, the proof is more perplexing. After reading and re-reading till I have become heartily tired of it, I have not been able to feel very confident upon this point.

The truth is, the case should have been tried in the court of chancery, and if one chancellor could not do it, another should have been called in. The counsel, had they been fully aware of the embarrassment of an attempt to settle such a complicated matter of account in this court, without the aid of explanations in detail, and thus virtually performing the office of Master and Chancellor, under the greatest disadvantages, would not have brought this case into this court, in the shape in which it was brought here.

But we have done the best we could. We see nothing in the case to satisfy us that proper diligence in making collections, or in attempting to make them has not been used. We should be inclined to believe, that under the circumstances the best had been done that could have been in that respect.

In regard to surrender of securities, or more properly diverting them from the bank to the private use of S. C. Raymond, or his son, to the detriment of the bank, and of Knight's sureties to the bank, we have entertained more hesitation and more doubt. And if a proper account of this matter had been taken in the court of chancery by an experienced master, and with the aid of the parties and counsel at hand, to give the necessary explanations, we think it probable something might have been made out to the advantage of the orator, and if that had been done, we should not have felt inclined to disturb it, unless upon the most clear and satisfactory perception of its falsity. But that not having been done, the case comes before us under very great difficulties, as we have said.

We must now be able to see clearly, that there has been such a diversion of the securities, upon which the plaintiff was justified in relying for his indemnity. We shall probably leave this in such a shape that if the orator thinks it can be made available to him he may apply to some chancellor to have a specific account taken of the disposition of all the collateral securities held by the bank. But we think it best to suggest our difficulties here.

The indebtedness of Knight to the bank is very much beyond

that of the plaintiffs suretyship, and if it should be shown that a portion of the collateral security had been misapplied or improperly surrendered, but with no purpose of defrauding plaintiff, it would still remain to be determined whether the plaintiff should be excused from his indorsement, if there still remained over and above the amount of such securities, so lost to the bank an amount of indebtedness equal to the plaintiff's indorsements.

The Citizens' Bank bills worth $1,000 is one of these items. If Spencer is correct in saying that these bills at the time of the indorsements being made, were shown to Luther Loomis at all, of which I think there is some doubt, then he must have been aware that they were handed over to Cleaveland, as that was no doubt done in his presence. But if they had not been shown to him at all during that interview, when he made his indorsement of Cleaveland's notes, he would not be supposed to understand when these bills were handed over in his presence, as he would if he knew what the package contained.

But if they were shown to him, which is perhaps proved, it will be natural to conclude that he understood they were going into the hands of the mining company, as was agreed, or else they would not have been immediately handed over in his presence, which seems to me to be most abundantly proved. The only doubt I should then have would be whether he did not make some reliance upon them, as an aid towards raising the credit of the Lead Company, and whether from what was said he was not justified in this expectation. And if so, whether the application of these bills to pay Cleaveland's debt to H. S. Raymond would not be such a fraud upon Loomis as a court of equity ought to regard, is worthy of consideration, if such should prove to be the facts in the case.

As to Wilkie's notes, which were surrendered at that time, and the Lead Company stock, there does not seem to be much proof that they were of any available value, or that they were even in a situation to be relied upon by plaintiff for indemnity.

The Morris notes indorsed by Hall, seem to have been made available for some $5,000. Raymond says they were always his property, and never pledged for the security of the Bank. If I do not forget, Knight says they were once holden to the Bank; but by his consent taken by Raymond. If it should be necessary

XXIV. 17

---

Loomis *v.* Fay and Patchin.

---

to take the account, this can be looked into.   And so of all the other collaterals, most of which were desperate from the first.

Whether the *attempt* on the part of Raymond, to save to himself $5,000 of the plaintiff's indorsement to the Bank, would be regarded as such a fraud upon the plaintiff as to release him, is certainly very questionable.   It is clear that such an attempt is fraudulent, as to the Bank, and seems to have been understood by Raymond as a matter resting chiefly in the courtesy of the Bank. We hardly see how it should be regarded as exonerating plaintiff.

This is all perhaps, which it is incumbent upon us to say at present.   There is, however, about this case a certain air which leads all right minded men to feel where the real justice, as between these parties, lies.   But it is a view not hinted at very directly in the bill, and it is one not very clearly defined in the books.   It is, that upon payment by the orator to the defendants of all which they paid the Bank for these notes, and all costs and expenses out, including counsel fees, and pay for their own time, the notes should be surrendered.

Beyond this is a mere penalty upon the plaintiff, and is taking money out of his pocket, and putting it into that of the defendants, without any equivalent.·  It is punishing one man and rewarding another, without any true basis in moral justice or equity.   The Bank certainly could not have collected of plaintiff more than sufficient to indemnify themselves.   If they see fit to transfer their rights for a less sum than is due, this sum ought not to be enforced against a mere surety.   This as a court of conciliation, we could very cheerfully recommend, and as a court of equity in the last resort should rejoice to see enforced.

This being an application to decree a specific act, a court of equity may annex such conditions to the decree as they judge proper and equitable, and make a decree of the surrender, of the notes, depend upon the payment of any sum of money, which in moral justice they might deem reasonable.   If the chancellor should finally bring the parties to this point, it would be more satisfactory to us, than to compel the plaintiff to pay the whole sum, and unless this can be done, a court of equity, looking at the uncertainty of the proofs as to many of the collaterals, might in its discretion, hesitate to decree the absolute surrender of the securities, which ought not to be done except upon the fullest and most

satisfactory proof, and would more naturally incline to leave the parties to their legal rights in a court of law, where a jury will often administer more absolute and impartial moral justice than can be done, consistent with the technical rules of the law.

The decree of the chancellor is reversed, the case remanded to the court of chancery to be there tried and finished, before it is sent here again.

It is very probable, the orator may deem it important to make some alterations in the form of his bill, or he may not. We have not sufficiently examined the subject to be able to make any definite intimations upon this point.

The allegations in the bill, which is attempted to be sustained by proof, and to which there is some *direct testimony*, that the indorsement was made under an assurance from Raymond, that the plaintiff should never be holden upon the indorsement, if fully established in a court of equity, would still impose upon the plaintiff the obligation to refund to the defendants whatever sum they had been induced to pay out in faith of the plaintiff's indorsement, which was apparently valid and binding. This is in accordance with the general rule in a court of equity, in decreeing the surrender of deeds and other writings, to require innocent holders to be reimbursed whatever sums they have been induced to advance upon the credit of such contracts. The case of *Head* v. *Egerton*, 3 P. Wms. 280, where the first mortgagee, by omitting to take possession of the title deeds of the estate, put it in the power of the mortgagor to impose upon the second mortgagee, and then brought a bill to obtain possession of the deeds, and the court required him to first pay the second mortgagee his money. In 2 Story Eq. Jur. 767 is between to be an authority justifying a court of equity if they should decree a surrender of the notes to require the defendants to be indemnified, for what they have paid in faith of the indorsement being genuine. And it is questionable how far notice to defendants of a defense claimed, will deprive them of this equity.